UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEFFREY J. VIENS, *et al.*,<br>    *Plaintiffs*,<br>        *v.*<br>AMERICA EMPIRE SURPLUS LINES INS. CO.,<br>    *Defendant*. | Civil No. 3:14cv952 (JBA)<br><br>June 23, 2015 |

**RULING DENYING DEFENDANT'S MOTION TO DISMISS**

Defendant American Empire Surplus Lines Insurance Company moves [Doc. # 37] to dismiss the Second Amended Complaint [Doc. # 30] in which Plaintiffs Jeffrey Viens, Pamela Viens, Karen Wellikoff, Finney Lane Realty Associates, LLC, and the Connecticut Fair Housing Center allege discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA") and the Connecticut Fair Housing Act, Conn. Gen. Stat. § 46a-63, *et seq.* ("CFHA") by Defendant's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance. Plaintiffs contend that this practice has a disparate impact on racial minorities and is impermissible discrimination under state law against those receiving housing assistance. For the reasons that follow, Defendant's motion is denied.

I.      **Facts Alleged**

Mr. and Mrs. Viens and Ms. Wellikoff, through Finney Lane Realty Associates, are landlords who rent apartments to tenants receiving assistance under the Section 8 Existing Housing Program administered by the United States Department of Housing and Urban Development ("HUD") in which participants find apartments in the private

market and pay in rent 30 to 40 percent of their gross income while HUD pays the landlord a subsidy equaling the remainder of the rent. (2d Am. Compl. ¶¶ 4–7, 13–14.)

Mr. Viens owns three properties in Willimantic, Connecticut, each of which has a Latino tenant who uses a Section 8 voucher. (*Id.* ¶¶ 28–31.) Starting in April 2013, Mr. Viens' properties were insured under a property policy issued by Defendant. In January 2014, however, he received a written notice of non-renewal from Defendant, stating that the policy would be canceled effective April 2014 for the stated reason that "RISK NO LONGER MEETS CARRIER UNDERWRITING GUIDELINES" with a handwritten note stating, "Subsidized Housing—Section 8." (*Id.* ¶¶ 33–43.) The Viens were later informed that the non-renewal was the result of the number of tenants receiving Section 8 assistance at their properties. (*Id.* ¶ 45.) Because of this non-renewal, the Viens were forced to acquire replacement insurance coverage that provided less favorable terms and cost considerably more. (*Id.* ¶¶ 52–53.)

Ms. Wellikoff, through Finney Lane Realty Associates, is a partial owner and property manager of a three-unit property located at 10 Finney Lane in Stamford, Connecticut, which has rented to tenants receiving Section 8 assistance over the years, each of whom was Latino or African-American. (*Id.* ¶¶ 54–56, 7, 59–60.) In November 2012, an inspector employed by Defendant visited the Finney Lane property and asked Ms. Wellikoff whether any "Section 8 tenants" resided there. (*Id.* ¶¶ 67–68.) Shortly after Ms. Wellikoff confirmed that she rented to Section 8 tenants, an underwriter from American Empire told Ms. Wellikoff that Defendant had understood there to be no Section 8 tenants at the property and because two of the three units were occupied by such tenants, she would have to pay an additional yearly premium of $575 or face

2

cancelation of both her property and liability policies. (*Id.* ¶¶ 71–73.) Ms. Wellikoff responded that the demand "constituted illegal discrimination on the basis of lawful source of income" and refused to pay the additional premiums. (*Id.* ¶ 73.) After Ms. Wellikoff refused demands for increased premiums in April, May, June, and July of 2013, Defendant sent her a notice of cancelation of the policy, listing the reason as "non payment of premium for endo[r]sement to agent." (*Id.* ¶¶ 74–77.) As a result, Ms. Wellikoff was forced to operate the Finney Lane property without insurance for three months and eventually had to obtain a replacement policy that was more expensive and provided less favorable coverage. (*Id.* ¶¶ 79–81.)

Plaintiff the Connecticut Fair Housing Center ("CFHC") is a "nonprofit civil rights organization dedicated to ensuring that all people have equal access to housing opportunities in Connecticut," which "focuses on the intersection of housing discrimination and poverty." (*Id.* ¶ 82.) CFHC has received a "high volume" of complaints about discrimination based upon lawful source of income and Defendant's use of discriminatory underwriting criteria have "frustrated and continue to frustrate CFHC's mission of ensuring that all people have equal access to housing opportunities in Connecticut" and required it to "divert its scarce resources and staff away from other activities and direct them towards investigating and counteracting" the practice. (*Id.* ¶¶ 85–86.)

Plaintiffs seek certification of a class action lawsuit on behalf of "all similarly situated landlords of residential rental units in the state of Connecticut who are prohibited by state law from refusing to rent to tenants because of the tenants' use of Section 8 vouchers" and "who have been potentially subject to the defendant's unlawful

underwriting criteria resulting in either termination of their insurance or increased premiums due." (*Id.* ¶ 90.)

Plaintiffs assert claims in Count One under the CFHA for (1) discrimination "in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" lawful source of income, Conn Gen. Stat. § 46a-64c(a)(2); (2) publication of a statement or notice with respect to the rental of a dwelling that indicates a "preference, limitation or discrimination based on lawful source of income," *id.* § 46a-64c(a)(3); (3) making a residential real-estate-related transaction unavailable based on lawful source of income, *id.* § 46a-64c(a)(7); (4) discrimination in the terms or conditions of a residential real-estate-related transaction based on lawful source of income, *id.*; and (5) coercion, intimidation, threatening, or interference with the landlords' "exercise or enjoyment of" their right to rent to individuals without consideration for their lawful source of income, *id.* § 46a-64c(a)(9); (*see* 2d Am. Comp. ¶¶ 103–07).

Plaintiffs also assert claims for discrimination on the basis of race and national origin under both federal and state law (Counts Two and Three) contending that because African-American and Latino households are 12 times more likely to participate in the Section 8 program than white non-Hispanics, "the defendant's use of discriminatory insurance underwriting criteria actually or predictably results in a significantly disproportionate impact on the basis of race and national origin" and any non-discriminatory business purpose could be achieved by "less discriminatory underwriting criteria." (2d Am. Compl. ¶¶ 18–19, 112, 117, 121, 126.)

## II.     Discussion[1]

### A.     Source of Income Discrimination (Count One)

The CFHA protects tenants from various forms of discrimination based on their "lawful source of income" and is "designed to provide that low income families 'may not be rejected or denied a full and equal opportunity for . . . public accommodation based solely on the presence of [their lawful source of] income.'" *Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 250 Conn. 763, 777 (1999) (quoting 32 H.R. Proc., Pt. 25, 1989 Sess., p. 8776) (alterations in original)). Lawful source of income includes "income derived from . . . housing assistance," Conn. Gen. Stat. 46a-63(3), such as Section 8 vouchers, *see Sullivan Assocs.*, 250 Conn. at 775 ("[T]he lawful sources of income protected from discrimination by § 46a-64c include section 8 rental subsidies as a form of housing assistance." (internal quotation marks omitted)).

The statute provides in relevant part:

(a) It shall be a discriminatory practice in violation of this section . . . .
(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . lawful source of income. . . .

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Detailed allegations are not required but a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (alterations in original).

(3) To make, print or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . lawful source of income . . . or an intention to make any such preference, limitation or discrimination. . . .

(7) For any person or other entity engaging in residential real-estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of . . . lawful source of income. . . .

(9) To coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this section.

Conn. Gen. Stat. § 46a-64c.

Defendant contends that "Plaintiffs lack a private right of action to pursue these claims, because they are outside the protected class expressly granted such a right, and their claimed injuries are not linked to discrimination against the protected class." (Def.'s Mem. Supp. [Doc. # 34] at 4.) Defendant's argument thus appears to be twofold: (1) only protected class members under the CFHA may bring claims to redress violations of the Act and (2) a CFHA plaintiff's claimed injuries must be linked to an act of discrimination against protected class members.

### B.    Who May Bring Claims to Redress Violations of the CFHA

On the first point, the Court disagrees that only those in a CFHA "protected class"—here, tenants using Section 8 vouchers—may bring a claim to redress a violation of the statute, because the CFHA provides that "*[a]ny person* claiming to be aggrieved by a violation of section 46a-64c . . . may bring an action." Conn. Gen. Stat. § 46a-98a

6

(emphasis added).[2] This provision confers standing "as broadly as is permitted by Article III of the Constitution," *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (quoting *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 209 (1972)),[3] and "requires only that a private plaintiff allege 'injury in fact' within the meaning of Article III of the Constitution, that is, that he allege 'distinct and palpable injuries that are fairly traceable to [defendants'] actions,'" *AvalonBay Communities, Inc.*, 256 Conn. at 592 (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 375–76 (1982)).

Defendant nevertheless contends that this standing provision, § 46a-98a, is limited by the substantive anti-discrimination provision, § 46a-64c that "refers only to buyers, renters, and prospective purchasers and tenants" and not "landlords nor the CFHC." (Def.'s Mem. Supp. at 5.) Defendant thus maintains that the CFHA only "provides a private right of action to a person if that person has been discriminated against because of his or her own lawful source of income." (*Id.* at 6.)

Defendant's position is at odds with the conclusions of courts that have recognized that parties who have not been directly discriminated against have standing to pursue claims under the FHA and CFHA where they sustain injuries that are causally

---

[2] The definition of "person" includes "one or more individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees, trustees in bankruptcy, receivers and the state and all political subdivisions and agencies thereof." Conn. Gen. Stat. § 46a-51(14).

[3] The FHA likewise extends standing to any "aggrieved person," 42 U.S.C. § 3613(a)(1)(A), and the Connecticut Supreme Court has generally interpreted the CFHA in tandem with federal law, *see AvalonBay Communities, Inc. v. Town of Orange*, 256 Conn. 557, 591 (2001) ("[I]n addressing claims brought under both federal and state housing laws, we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes." (internal quotation marks omitted)).

related to discrimination against protected class members.[4] For example, in *Trafficante*, the Supreme Court held that existing white tenants in a housing complex had standing to assert a claim that their landlord discriminated against nonwhite prospective tenants on the basis of their race in rental applications, recognizing that the "exclusion of minority persons from the apartment complex is the loss of important benefits from interracial associations." 409 U.S. at 209-10.

The Supreme Court later explained that a party that is "not granted substantive rights by [the FHA] . . . may sue to enforce the [FHA] rights of others . . . . [A]s long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed. The central issue . . . is not who possesses the legal rights protected by [the FHA], but whether respondents were genuinely injured by conduct that violates *someone's* [FHA] rights, and thus are entitled to seek redress of that harm. . . ." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n. 9 (1979); *see also Keller v. City of Fremont*, 719 F.3d 931, 947 (8th Cir. 2013) (holding that a landlord had standing to assert a FHA claim challenging an ordinance that prohibited renting to "illegal aliens," because "the restrictions would likely cause [the landlord] to lose some tenants and restrict the pool of prospective tenants, causing economic injury.").

Plaintiffs have adequately alleged such injury. The Viens and Finney Lane Realty Associates have alleged that after Defendant denied the Viens coverage (2d Am. Comp. ¶¶ 41–43, 48–53) and increased Finney Lane Realty Associates' premiums (*id.* ¶¶ 71–72,

---

[4] In addition, as discussed *infra*, the CFHA does not just protect tenants but also protects third parties who aid or encourage protected class members in the exercise or enjoyment of their CFHA rights. *See* Conn. Gen. Stat. § 46a-64c(a)(9); *Frazier v. Rominger*, 27 F.3d 828, 833 (2d Cir. 1994).

81), they were forced to obtain less comprehensive replacement coverage at a higher price (*id.* ¶¶ 52–53, 81). The CFHC has alleged harm because "[u]nderwriting criteria that compel landlords to refuse to accept or restrict acceptance of tenants using housing subsidies" has required it "to divert its scarce resources and staff away from other activities and direct them towards investigating and counteracting the underwriting criteria employed by the defendant" and frustrates its mission by creating impediments "that make it more difficult and more expensive for landlords to accept housing subsidies." (*Id.* ¶¶ 86–87.) In *Olsen*, the Second Circuit held that "a not-for-profit corporation devoted to fair-housing advocacy and counseling" had standing to assert a FHA claim on behalf of prospective renters discriminated against on the basis of disability, because the organization "had expended resources in investigating and advocating on the [victims'] behalf." 759 F.3d at 158. Therefore, Plaintiffs have adequately alleged injury in fact from Defendant's alleged conduct.

### C.   Whether Plaintiffs' Alleged Injuries Must be Linked to Discrimination Against Protect Class Members

Defendant's second argument—that Plaintiffs' claimed injuries must be linked to an act of discrimination against protected class members (Def.'s Mem. Supp. at 4)—presents a closer question. At oral argument, Plaintiffs clarified that they do not claim that they were the direct victims of discrimination as Defendant initially characterized their argument. (*See id.* at 6 ("Plaintiffs claim that if a landlord is charged higher prices by an insurer due to the presence of a tenant using § 8 vouchers, *the landlord has been discriminated against* by virtue of the tenant's lawful source of income.") (emphasis added).) Rather, Plaintiffs contend that the tenants have been discriminated against while

the harm caused by such discrimination has been borne by Plaintiffs, who have had to pay higher insurance premiums. Defendant counters that absent any allegation that Section 8 voucher holders have been harmed, Plaintiffs have "failed to allege the *sine qua non* of a fair housing claim—an alleged act of discrimination against a member of a protected class." (Reply [Doc. # 36] at 3.)

As an initial matter, Defendant's interpretation of the CFHA fails to recognize the breadth of Plaintiffs' five distinct claims in Count One. (*See* 2d Am. Comp. ¶¶ 103–07). The scope of conduct prohibited by the CFHA is not limited to direct discrimination "in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith," Conn Gen. Stat. § 46a-64c(a)(2), but also includes (1) coercion, intimidation, threatening, or interference "with any person in the exercise or enjoyment of" rights under the Act, § 46a-64c(a)(9), and (2) publication of a statement indicating a "preference, limitation or discrimination based on lawful source of income," *id.* § 46a-64c(a)(3).

### 1.   Interference Claim

The anti-interference provision, § 46a-64c(a)(9)[5], "protects third parties, not necessarily members of the protected class, who aid or encourage protected class members in the exercise or enjoyment of their Fair Housing Act rights," *Frazier v. Rominger*, 27 F.3d 828, 833 (2d Cir. 1994), and thus "does not necessarily deal with a discriminatory housing practice, or with the landlord, financer or brokerage service guilty

---

[5] The FHA provides nearly identical protection. S*ee* 42 U.S.C. § 3617. Plaintiffs have withdrawn their federal interference claim for "a variety of reasons" not specified without conceding that this claim was not viable. (Pls.' Opp'n at 23 n.11.) They maintain that the Court should utilize FHA precedent to interpret the CFHA. (*Id.* at 23.)

of such practice. It deals with a situation where no discriminatory housing practice may have occurred at all because the would-be tenant has been discouraged from asserting his rights, or because the rights have actually been respected by persons who suffer consequent retaliation," *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975).

Plaintiffs have alleged that Defendant interfered with the landlords' "right and obligation to rent to individuals without consideration for their lawful source of income" (2d Am. Compl. ¶ 107) when it charged higher premiums and canceled coverage— essentially imposing a financial penalty on the Plaintiff-landlords for complying with their obligations under the CFHA. In *Nevels v. W. World Ins. Co.*, 359 F. Supp. 2d 1110, 1122 (W.D. Wash. 2004), the district court recognized a similar interference claim brought by operators of adult family homes against a surplus lines insurer alleging that the refusal to renew property and/or liability insurance coverage because adults with mental illnesses resided in the properties constituted interference under the FHA. The court reasoned "that Defendant interfered with [the plaintiff-landlords'] ability to provide housing for mentally disabled individuals when Defendant threatened to cancel their insurance policies" because the "FHA provides Plaintiffs and their tenants with a right to be free from housing discrimination based on disability." *Id.* Plaintiffs here have likewise

alleged that Defendant interfered with the landlords' aiding of their tenants' exercise and enjoyment of their right to use of Section 8 vouchers.[6]

### 2.    *Publication Claim*

As to Plaintiffs' claim for publication of a statement indicating an unlawful preference or discrimination, Conn. Gen. Stat. § 46a-64c(a)(2), the Second Circuit has held that the analogous provision of the FHA can be violated even if the statement does not actually result in the denial of housing, *see United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005), and it "need not be targeted at a single, identifiable individual at all," *Rodriguez v. Vill. Green Realty, Inc.*, -- F.3d --, No. 13-4792-CV, 2015 WL 3461554, at *16 (2d Cir. June 2, 2015). "What matters is whether the challenged statements *convey* a prohibited preference or discrimination to the ordinary listener." *Id.* at *17. Plaintiffs have adequately alleged that Defendant made and printed statements that conveyed a prohibited preference against Section 8 tenants.

---

[6] Defendant also contends that Plaintiffs' claim must "necessarily fail" because § 46a-64c(a)(9) is a "prohibition against retaliation" and Plaintiffs have failed to state a valid predicate claim under the CFHA as the basis for the alleged retaliation. (Def.'s Mem. Supp. at 20.) As discussed below, Plaintiffs have alleged underlying violations of the CFHA, which does not simply prohibit retaliation; it also prohibits coercion, intimidation, threatening, or interference, Conn. Gen. Stat. § 46a-64c(a)(9), and is not dependent on an underlying violation of the CFHA, *see Lachira v. Sutton*, No. 3:05-CV-1585 (PCD), 2007 WL 1346913, at *17 (D. Conn. May 7, 2007) ("Section 3617 may be read as making any violation dependent on an underlying substantive violation of §§ 3603 through 3606, however, courts within this circuit have held that § 3617 can, at times, serve as a separate basis for an FHA claim even where there is no predicate for liability under any of the statute's specifically referenced enumerated substantive provisions.").

### 3.    Discrimination Based on Lawful Source of Income Claim

The nature of Plaintiffs' claims for discrimination in real estate-related transactions, Conn. Gen. Stat. § 46a-64(c)(a)(7), and "in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" lawful source of income, *id.* § 46a-64c(a)(2), are less clear. At oral argument, Defendant characterized its challenge to Plaintiffs' § 46a-64c(a)(2) claim as primarily one of failure to state a claim. However, in its memorandum of law in support of its Motion to Dismiss, Defendant claimed only that Plaintiffs lacked standing under the CFHA. (Def.'s Mem. Supp. at 4 ("Plaintiffs lack a private right of action to pursue these claims . . . ").) By recasting its argument as failure to state a claim in its reply brief and at oral argument, Defendant deprives Plaintiffs of an adequate opportunity to respond. *See In re Dobbs*, 227 F. App'x 63, 64 (2d Cir. 2007) ("[I]t was entirely proper for the District Court to decline to consider [an] argument, raised for the first time in [a] reply brief . . . ."). The nature of Plaintiffs' discrimination claim is nevertheless also potentially relevant to standing if, as Defendant maintains, Plaintiffs have standing only if

"their claimed injuries are . . . linked to discrimination against the protected class."[7] (Def.'s Mem. Supp. 4; *see also id.* at 14–15 ("Landlords and the CFHC lack a private right of action to assert claims under the CFHA . . . where there are no allegations that tenants were discriminated against based on the tenants' § 8 vouchers.).")

At oral argument, Plaintiffs maintained that they were not required to allege injury to Section 8 tenants. The Court disagrees because in the absence of injury to Section 8 tenants, Plaintiffs have not explained how Defendant has "discriminated" against tenants in violation of Conn. Gen. Stat. §§ 46a-64c(a)(2) and 46a-64(c)(a)(7). However, as Plaintiffs articulated at oral argument, injury to Section 8 tenants can be plausibly inferred at this stage from Defendant's alleged conduct because if landlords are

---

[7] The parties do not cite any cases regarding the extent to which a FHA or CFHA plaintiff's injury must be linked to discrimination against protected class members. In the context of the Rehabilitation Act ("RA"), which like the FHA confers standing to any "person aggrieved," the Second Circuit has recognized that non-disabled parties can bring "associational discrimination claims," but to do so they must "prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 279 (2d Cir. 2009). Thus, in *Loeffler*, the children of a deaf patient could bring their own claims under the RA based on a hospital's failure to provide a sign-language interpreter to their father, because as a result, the children were forced to provide such services for their father and "were consequently taken out of school and exposed to their father's suffering." *Id.* at 280. In *Rodriguez*, the Second Circuit recently held that the parents of a minor child who "a reasonable jury could conclude" was either actually disabled under the FHA or was perceived by a broker to be disabled under the FHA had shown "injury in fact" because the defendant caused emotional harm and "forced them to leave their home because of their daughter's disability." 2015 WL 3461554, at *5, *17 n.12. Because it concluded that there was a genuine dispute as to whether the daughter was disabled, the Second Circuit did not reach the defendant's argument that the "plaintiffs' injuries do not bear a sufficient nexus to discrimination based on disability" because the child was not actually disabled under the FHA. *Id.* at *17 n.12.

forced to pay a financial penalty for renting to Section 8 tenants, they will be less likely to participate in the program which would result in less housing being available to Section 8 participants.[8] *See Havens Realty Corp*, 455 U.S. at 377 ("[I]n the absence of further factual development, we cannot say as a matter of law that no injury could be proved.").

A number of courts considering claims similar to those pled in this case have recognized claims under the FHA and CFHA by landlords alleging discrimination against their tenants that primarily resulted in harm to the landlords, not the tenants. For example, in *Nevels*, the operators of the adult family home did "not allege that disabled individuals were turned away from their facilities" after the defendant canceled their insurance. 359 F. Supp. 2d at 1119. Thus, while the cancelation "did not literally 'make housing unavailable' because [the home operators] continued to care for disabled individuals," they still stated a discrimination claim under the FHA because the insurer's practice "created a powerful disincentive to provide care for disabled individuals" by forcing them to bear the risks of operating without insurance coverage and "'[t]his undoubtedly could make owning and retaining real property unavailable.'" *Id.* (quoting *United Farm Bureau Mutual Ins. Co., Inc. v. Metropolitan Human Relations Comm'n,* 24 F.3d 1008, 1014 n.8 (7th Cir. 1994)).

Likewise in *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 6 (D.D.C. 1999), the district court held that "the refusal to provide standard property insurance at ordinary rates to

---

[8] Although landlords are prohibited under the CFHA from declining to rent to prospective tenants on the basis of their lawful source of income, *see* Conn. Gen. Stat. § 46a-64c(a)(2), Defendant's alleged conduct nevertheless creates an incentive for them to not comply with this requirement and to the extent that landlords yield to this incentive, less housing would be available for Section 8 tenants.

landlords who rent their homes to disabled persons" states a claim under the FHA for "mak[ing] unavailable or den[ying] a dwelling" because "[i]f, in order to rent to disabled persons, a landlord must risk losing her home through loss of mortgage financing, loss of catastrophe insurance, and loss of liability insurance, she will be disinclined to rent to disabled persons. Such powerful disincentives to rent to disabled persons, make housing unavailable to them."[9]

In *Francia v. Mount Vernon Fire Ins. Co.*, No. CV084032039S, 2012 WL 1088544, at *2 (Conn. Super. Ct. Mar. 6, 2012) (Wilson, J.), the state court recognized a claim similar to that asserted by Plaintiffs here: that an insurer's "practice of charging increased premiums for buildings with subsidized tenants, and its requirements that landlords certify that a particular building will not have more than 20% subsidized tenants using housing vouchers during the coverage period, violate Connecticut's prohibition against discrimination based on lawful sources of income." Surveying federal case law, the Superior Court noted that in "order to fulfill its remedial purpose, courts have given an

---

[9] *Nevels* and *Wai* both cited language in the FHA, which prohibits "discriminat[ion] in the sale or rental, or to *otherwise make unavailable* or deny, a dwelling" based on protected characteristics. 42 U.S.C. §§ 3604(a), (f)(1) (emphasis added). Plaintiffs here do not assert claims under the provisions of the CFHA that prohibit conduct that "otherwise make[s] unavailable" housing, Conn. Gen. Stat. § 46a-64c(a)(1), but rather allege discrimination in the provision of services related to the sale or rental of a dwelling, *id.* § 46a-64c(a)(2), publication of a statement indicating a preference, limitation, or discrimination based on lawful source of income, *id.* § 46a-64c(a)(3), interference with the landlords' right and obligation to rent to individuals without consideration for their lawful source of income, *id.* § 46a-64c(a)(9), and discrimination in a residential real-estate-related transaction, *id.* § 46a-64c(a)(7). The harm to tenants from Defendant's alleged conduct is the same—creating a disincentive for landlords to participate in the Section 8 program.

expansive reading to the protections against housing discrimination embodied within the FHA" and "have found viable claims for discriminatory conduct that [were] not directly connected to the rental or sale of housing, but which nonetheless had a discriminatory impact on equal housing opportunities." *Id.* at *4.[10]

From the facts alleged, it can be plausibly inferred that Defendant's conduct has a discriminatory impact on housing opportunities, that Defendant has published statements indicating a discriminatory preference, and has interfered with Plaintiffs' right and obligation to rent to tenants without consideration of their lawful source of income. Therefore, Defendant's motion to dismiss Count One is denied.

### D. Race and National Origin Disparate Impact Claims (Counts Two and Three)

Defendant does not dispute Plaintiffs' standing as to Counts Two and Three, which allege disparate impact discrimination based on national original and race, but rather contends that: (1) the FHA and CFHA only apply to claims related to the acquisition of housing, (2) the statutes do not apply to insurance transactions, (3) the FHA and CFHA only prohibit intentional discrimination, not disparate impact claims, and (4) the FHA claim is "reverse preempted" by the McCarran-Ferguson Act.

---

[10] In *Francia*, the plaintiff alleged that the insurer's conduct would harm Section 8 tenants because the landlord "would not invest in rental properties if he could not obtain general liability insurance" and because the insurer stated that the landlord could only have 20% of his units occupied by Section 8 recipients, this "provision would have the effect of denying rental opportunities, because 8 of 10 of the plaintiff's current units at its Westland Street property would necessarily be unavailable to housing assistance recipients for no other reason than their lawful source of income." 2012 WL 1088544, at *8. As discussed *supra*, a similar harm can be inferred at this stage from the circumstances alleged in this complaint, the existence of which can be tested on a fully developed record.

1.     *Previously Acquired Dwelling*

Defendant contends that both the FHA and CFHA "are limited to the initial acquisition of housing, and do not apply where, as here, the alleged wrongdoing occurs after the dwelling has already been sold." (Def.'s Mem. Supp. at 15–16.)

> The FHA provides that it is unlawful:
>
> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services[11] or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b). The CFHA provision is nearly identical although it also prohibits discrimination based on lawful source of income. *See* Conn. Gen. Stat. § 46a-64c(a)(2). The unlawful publication provision of the CFHA likewise refers to "the sale or rental of a dwelling." Conn. Gen. Stat. § 46a-64c(a)(3).

There is a circuit split as to the extent to which the FHA reaches post-acquisition discrimination claims. In *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009), the Ninth Circuit concluded that post-acquisition

---

[11] Plaintiffs maintain that insurance, as a "service" connected to buying and maintaining a dwelling, is covered by the statute. HUD regulations provide:

> It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

24 C.F.R. § 100.70(b). The regulation explains that it prohibits activities including "[r]efusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.70(d)(4). The Supreme Court has recognized that as the agency charged with enforcement of the FHA, HUD's construction of the statute "is entitled to great weight." *Trafficante*, 409 U.S. at 210.

claims were covered in a case alleging discrimination in the provision of municipal services, reasoning that the inclusion of the word "privileges" in 42 U.S.C. § 3604(b) "implicates continuing rights, such as the privilege of quiet enjoyment of the dwelling," and the "natural reading" of the statute "encompasses claims regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling."  The court noted that "there are few 'services or facilities' provided at the moment of sale, but there are many 'services or facilities' provided to the dwelling associated with the occupancy of the dwelling." *Id.* The Ninth Circuit also noted that "limiting the FHA to claims brought at the point of acquisition would limit the [A]ct from reaching a whole host of situations that, while perhaps not amounting to constructive eviction, would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling." *Id.* at 714.

The Seventh Circuit has read the statute more narrowly, concluding that the text of the FHA "indicates concern with activities, such as redlining, that prevent people from acquiring property" and "contains no hint either in its language or its legislative history of a concern with anything but *access* to housing." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004). *Halprin* held that § 3604 did not apply to allegations of anti-Semitic harassment and vandalism against Jewish property owners in a suburban housing subdivision because the plaintiffs were "complaining not about being prevented from acquiring property but about being harassed by other property owners." *Id.* The Seventh Circuit suggested, however, that the FHA "might be stretched far enough to reach" post-acquisition discrimination that results in "constructive eviction" because 42 U.S.C. § 3604(a) prohibits refusing to sell or rent "or

otherwise mak[ing] unavailable or deny[ing]" housing on the basis of protected characteristics, and if, for example, "you burn down someone's house you make it 'unavailable' to him, and 'privileges of sale or rental' might conceivably be thought to include the privilege of inhabiting the premises." *Id.; see also Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) (reaffirming *Halprin*).

District courts in this Circuit that have addressed the issue have concluded that the FHA applies to post-acquisition claims.[12] For example, in *Davis v. City of New York*, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012), a class action lawsuit against New York City and its Housing Authority alleging an unconstitutional policy of stops and frisks in public housing buildings, the district court concluded that the FHA reached a post-acquisition claim for discrimination in the provision of police services. Discussing the split of authority, the court agreed with the Ninth Circuit's analysis that the inclusion of the words "privileges" and "services or facilities" both implied that the FHA reached "continuing rights" beyond the acquisition of housing. *Id.* (quoting *City of Modesto*, 583 F.3d at 713).

*Davis* further reasoned that this construction was warranted because construing the statute to allow intentional discrimination or sexual harassment against existing tenants would "make[] little sense" where the FHA is to "'be given broad and liberal construction.'" *Id.* (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir. 1994)). Finally, the district court reasoned that HUD regulations recognizing post-acquisition

---

[12] Defendant has not cited any Second Circuit or within circuit district court cases that have declined to recognize post-acquisition claims.

claims, on which Plaintiffs also rely, 24 C.F.R. § 100.65, were entitled to "great weight."[13] *Davis*, 902 F. Supp. 2d at 436 (quoting *Bloch*, 587 F.3d at 781). The Court finds this analysis persuasive and concurs with the conclusion in *Davis* and *City of Modesto* that post-acquisition claims are cognizable under the FHA.

Defendant asserts that the Connecticut Supreme Court's conclusion in *Webster Bank v. Oakley*, 265 Conn. 539, 558 (2003) that the CFHA does not apply to post-acquisition claims is fatal to Plaintiffs' theory. However, *Webster Bank* addressed only whether the FHA and CFHA "require a bank, which is foreclosing on a mortgage loan that it has serviced, to accommodate a disabled mortgagor's inability to make her loan payments."[14] 265 Conn. at 542.

The primary issue in *Webster Bank* was which of two provisions of the FHA applied to the mortgagor's claim: 42 U.S.C. § 3604(f)(1), which makes it unlawful to discriminate "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to

---

[13] Other courts in this Circuit have recognized post-acquisition claims under the FHA, albeit without attention to the split of authority on whether they are actionable. *See, e.g., Rhodes v. Advanced Prop. Mgmt. Inc.*, No. 3:10-CV-826 (JCH), 2011 WL 2076497, at *4 (D. Conn. May 26, 2011) ("The FHA also permits suits based on discrimination in the provision of repairs or maintenance" by existing tenants); *Khalil v. Farash Corp.*, 260 F. Supp. 2d 582, 589 (W.D.N.Y. 2003) ("[E]ven if plaintiffs were not forced to leave, they could still state a claim based on discrimination that they endured during their tenancy at the complex."); *Green v. Konover Residential Corp.*, No. 3:95CV1984 (GLG), 1997 WL 736528, at *11 (D. Conn. Nov. 24, 1997) (recognizing claim that tenants were "discriminated against on the basis of their race with respect to the condition of the premises").

[14] This claim was analyzed under both federal and state law without distinction. *Webster Bank,* 265 Conn. at 568 ("Inasmuch as the relevant provisions of the state and federal fair housing statutes in the present case are virtually identical, we apply the analysis that we utilized in evaluating the defendant's FHA[] claims.").

any buyer or renter because of a handicap," or 42 U.S.C. § 3605, which prohibits discrimination "in residential real estate-related transactions." The Connecticut Supreme Court concluded that a claim for discrimination in the enforcement of a mortgage loan agreement "unambiguously [fell] within the ambit of 42 U.S.C. § 3605," *Webster Bank*, 265 Conn. at 588, because § 3605 defined a "residential real estate-related transactions" as including the "making or purchasing of loans" to purchase a home, 42 U.S.C. § 3605(b)(1), and therefore "the specific applicability of § 3605 to the context of enforcement of mortgage loan agreements precludes the application of § 3604 in that same arena," *Webster Bank*, 265 Conn. at 558.

Defendant's reading of *Webster Bank* as standing for the proposition that § 3604(b) and its state counterpart do not apply to "services provided in connection with a 'dwelling previously acquired'" (Def.'s Reply at 4), sweeps too broadly from a holding confined to mortgage transactions which are excluded from § 3604 only because they, unlike insurance transactions, are explicitly included in § 3605.[15]

To summarize, this Court concludes that the FHA and CFHA apply to post-acquisition claims, because (1) the words "privileges" and "services or facilities" in the statutes connote continuing rights beyond the acquisition of housing; (2) HUD regulations, which the Supreme Court has recognized as holding "great weight,"

---

[15] In fact, *Eva v. Midwest National Mortgage Bank, Inc.,* 143 F. Supp. 2d 862, 883 (N.D. Ohio 2001), which the Connecticut Supreme Court adopted, acknowledged the viability of claims under § 3604 similar to those asserted by Plaintiffs here when the district court cited *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1354 (6th Cir. 1995) where the Sixth Circuit recognized a claim that an insurer "had refused, because of [the plaintiff's] sex, race, and the racial make-up of the area, to reinstate [the plaintiff's] insurance policy on a residential building that was located in a predominantly black area."

*Trafficante*, 409 U.S. at 210, recognize such claims, and (3) such claims are consistent with the "broad and liberal construction" given to the FHA and CFHA, *see Cabrera*, 24 F.3d at 388.

2.       *Residential Real-Estate Related Transaction*

Defendant next contends that Plaintiffs' claims under § 3605 of the FHA and its state counterpart are not viable because insurance is not a "residential real estate-related transaction" covered by these provisions. Section 3605 provides:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605(a). The term "residential real estate-related transaction" is defined as the "making or purchasing of loans or providing other financial assistance—(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate." *Id.* § 3605(b); *see also* Conn. Gen. Stat. § 46a-64c(a)(7).

Defendant relies primarily upon *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 297 (7th Cir. 1992) which held that property insurance is not a "residential real estate-related transactions" covered by § 3605, reasoning:

> It would strain language past the breaking point to treat property or casualty insurance as "financial assistance"—let alone as assistance "for purchasing . . . a dwelling." Insurers do not subsidize their customers or act as channels through which public agencies extend subsidies. They do not "assist" customers even in the colloquial sense that loans are "assistance" (a lender advances cash, with repayment deferred). Payment runs from the customer to the insurer. Insurance is no more "financial assistance" than a loaf of bread purchased at retail price in a supermarket

is "food assistance" or a bottle of aspirin bought from a druggist is "medical assistance."

*Id.*

Plaintiffs maintain that property insurance falls within the ambit of § 3605, "because it 'provides the financial assistance necessary' to maintain, repair, or construct a residential dwelling." (Pls.' Opp'n [Doc. # 35] at 21.) Several courts have accepted Plaintiffs' position. For example, the United States District Court for the District of Columbia rejected *N.A.A.C.P.*, reasoning that "by defining a real estate-related transaction as one involving a loan or '*other* financial assistance,' section 3605 indicates that 'financial assistance' includes loans, and thus should be construed more broadly than the traditional notion of a subsidy." *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 58 (D.D.C. 2002) (emphasis in original).

The court concluded that homeowners' insurance fell within the ambit of § 3605 because "individuals are often unable to purchase or to maintain financing for homes without homeowners insurance" and therefore "insurance provides the financial assistance necessary to maintain a dwelling." *Id.; see also Nevels*, 359 F. Supp. 2d at 1122 ("Giving the terms of the FHA a broad and generous construction, it is reasonable to conclude that the liability insurance at issue here is 'financial assistance' for the purposes

of § 3605 because such insurance is essentially necessary for the safe maintenance of Plaintiffs' adult group homes.").[16]

This Court is persuaded that the property and commercial general liability insurance policies at issue in this case could fit within the definition of a "residential real estate-related transaction." 42 U.S.C. § 3605(a). In reaching a contrary conclusion in *N.A.A.C.P.*, the Seventh Circuit rejected the notion that property insurance could constitute a form of "financial assistance" because insurers "do not subsidize their customers or . . . 'assist' customers even in the colloquial sense that loans are 'assistance.'" 978 F.2d at 297. This Court respectfully disagrees. Section 3605 does not contemplate that loans for the purchase of a home are the only form of "financial assistance" that fall within its ambit, because it refers to "loans or . . . *other financial assistance*," 42 U.S.C. § 3605(b)(1) (emphasis added), for not only purchasing a dwelling but also for "constructing, improving, repairing, or maintaining a dwelling," *id.* § 3605(b)(1)(A).

By identifying loans as a form of financial assistance, § 3605 is not limited to the notion of traditional subsidies. Insurance bears an analytical similarity to a loan in that both provide financing when needed for a predetermined fixed price—interest in the case of a mortgage and premiums in the case of insurance. *See* 1 Couch on Ins. § 1:6

---

[16] Citing a 1996 letter from HUD to the Illinois Department of Insurance, Plaintiffs contend that HUD has interpreted § 3605 in this manner as well. (Pls.' Opp'n at 21 & Ex. A ("Property insurance is also required to maintain a dwelling, and, thus enjoy the benefits and privileges of homeownership. Therefore, discrimination in the provision of property insurance constitutes discrimination in residential real estate-related transactions in violation of Section 3605.").) The Court recognizes that "an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking . . . . [does] not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

("Essentially, insurance is a contract by which one party (the insurer), for a consideration that usually is paid in money . . . promises to make a certain payment, usually of money, upon the destruction or injury of 'something' in which the other party (the insured) has an interest."). Payment of a claim is not gratuitous financial assistance or a subsidy but rather ensures that upon the occurrence of a covered event, insurance provides the necessary financial assistance to "repair[]" or "maintain[] a dwelling." 42 U.S.C. § 3605(b)(1)(A). Given the "broad and liberal construction" of the FHA, *Cabrera*, 24 F.3d at 388, property insurance is not excluded from the definition of a residential real estate-related transaction under § 3605 and Conn. Gen. Stat. § 46a-64c(a)(7).

### 3.    Disparate Impact Claims

Defendant American Empire acknowledges that the Second Circuit recognized disparate impact claims under the FHA in *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988), but contends that the "decision is no longer valid . . . in light of subsequent Supreme Court authority." (Def.'s Mem. Supp. at 29.) In *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005), a Supreme Court plurality recognized disparate-impact claims under the Age Discrimination in Employment Act, but on the basis that there were "key textual differences" in the statute between the provision recognizing claims of intentional discrimination and the provision recognizing disparate impact, the text of which "focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer." *Id.* at 236 & n.6 (emphasis in original); *see also Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 993 (1988) (recognizing disparate impact claims under Title VII).

The Supreme Court is currently considering the viability of disparate impact claims under the FHA, *see Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 46 (2014), but in the absence of a contrary ruling from the Court of Appeals or the Supreme Court, this Court is bound by Second Circuit precedent. *See, e.g., City of Los Angeles v. JPMorgan Chase & Co.*, No. 2:14-CV-04168 (ODW), 2014 WL 6453808, at *9 (C.D. Cal. Nov. 14, 2014) ("The Supreme Court's decision to take up the disparate-impact question in *Texas Department of Housing* also holds no sway over the FHA claim here, unless and until it holds that disparate-impact is not an available theory under the FHA."); *Folger v. City of Minneapolis*, No. CIV. 13-3489 (SRN) (JJK), 2014 WL 4187504, at *15 n.15 (D. Minn. Aug. 22, 2014) ("In short, until the Supreme Court squarely addresses the issue or the Eighth Circuit overrules its existing decisions, this Court is not the proper tribunal to find that the FHA is confined to disparate-treatment liability.").

Next, Defendant contends that even if disparate impact claims are generally cognizable under the FHA, claims that the "refusal to accept a § 8 tenant" has resulted in a disparate racial impact are exempted. (Def.'s Mem. Supp. at 22.) The Second Circuit has held that a prospective tenant cannot state a claim against a landlord who refused to accept Section 8 tenants, "agree[ing] with the Seventh Circuit's observation that because the Section 8 program is voluntary and non-participating owners routinely reject Section 8 tenants, the owners' 'non-participation constitutes a legitimate reason for their refusal to accept section 8 tenants and . . . we therefore cannot hold them liable for . . . discrimination under the disparate impact theory.'" *Salute v. Stratford Greens Garden*

*Apartments*, 136 F.3d 293, 302 (2d Cir. 1998) (quoting *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272, 1280 (7th Cir. 1995) (alterations in original)).

However, as Plaintiffs note, "*Knapp* and *Salute* are premised on the notion that participation in the Section 8 program by landlords is voluntary" (Pls.' Opp'n at 38), and that logic does not necessarily extend to a landlord's insurers. Even if landlords have the prerogative under federal law to reject Section 8 tenants, there is no sound reason why insurers should be immunized from claims of discrimination when such landlords have decided to accept Section 8 tenants, and thus *Salute* does not bar Plaintiffs' claims.[17]

4.    *McCarran-Ferguson Act*

Finally, Defendant contends that recognizing disparate impact claims under the FHA would conflict with the McCarran-Ferguson Act, which provides:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012(b). The Second Circuit has found "based on the historical context, the legislative history, and judicial interpretations of that history, that Congress, in enacting a statute primarily intended to deal with the conflict between state regulation of insurers and the federal antitrust laws, had no intention of declaring that subsequently enacted civil rights legislation would be inapplicable to any and all of the activities of an insurance

---

[17] Because Connecticut law provides protection for lawful source of income, the reasoning of *Salute* applying the FHA has no application to Plaintiffs' distinct claims under Connecticut law. While Defendant contends that the Connecticut Supreme Court has "recognized the authority of *Salute*" (Reply at 9), it did so for an unrelated proposition, i.e., the reach of the FHA's requirement of reasonable accommodations for persons with disabilities. *See Webster Bank*, 265 Conn. at 561 n.20.

company that can be classified as 'the business of insurance.'" *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982).[18]

The Connecticut law that Defendant contends a disparate-impact FHA claim would "invalidate, impair, or supersede" is Conn. Gen. Stat. § 38a-665(a), which provides the standards that an insurer "shall apply to the making and use of rates pertaining to commercial risk insurance" and states that "[r]ates shall not be excessive or inadequate, as herein defined, nor shall they be unfairly discriminatory,"[19] Conn. Gen. Stat. § 38a-665(a), and that "[c]onsideration shall be given, to the extent possible, to past and prospective loss experience within and outside this state" and other risk factors, Conn. Gen. Stat. § 38a-665(b). Defendant maintains that under Connecticut law "insurers are required to make rating and underwriting decisions on the basis of risk factors" and if "the FHA were construed as Plaintiffs seek, American Empire would affirmatively be *prohibited* from taking factors such as loss experience or a margin for underwriting profit into account if consideration of those factors had a disparate impact on protected groups,

---

[18] Defendant views this reasoning as undermined by *Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1099 (1983) in which a Supreme Court plurality ruled that McCarran-Ferguson Act applies to Title VII. However, after the Supreme Court vacated and remanded *Spirt* for the Second Circuit to consider *Norris*, the Second Circuit adhered to its prior decision, *see Spirt v. Teachers Ins. & Annuity Ass'n*, 735 F.2d 23, 29 (2d Cir. 1984).

[19] "Discriminatory" is not defined in the statute, but has been interpreted "in a broad manner to mean disparate treatment" where "no reasonable distinction can be found between those favored and those not favored," *Connecticut Podiatric Med. Ass'n v. Health Net of Connecticut, Inc.*, 302 Conn. 464, 476–77 (2011) (internal quotation marks omitted), as opposed to being limited to disparate treatment on the basis of impermissible characteristics such as race.

notwithstanding the fact that Connecticut law requires consideration of such factors" and it would thereby be in "an impossible position."  (Def.'s Mem. Supp. at 34.)

Although two courts outside this Circuit have held that the McCarran-Ferguson Act reverse preempts FHA claims, *see Am. Ins. Ass'n v. United States Dep't of Hous. & Urban Dev.*, No. CV 13-00966 (RJL), 2014 WL 5802283, at *11 (D.D.C. Nov. 7, 2014); *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 967–68 (8th Cir. 2008), the majority of the federal courts of appeals have held that enforcement of federal civil rights laws does not interfere with and frustrate the abilities of states to regulate insurance rate making, *see Dehoyos v. Allstate Corp.*, 345 F.3d 290, 298 & n.4 (5th Cir. 2003) ("[T]he Eleventh, Seventh, Fourth, Sixth, and Ninth Circuits all have determined that the [McCarran-Ferguson Act] does not prevent the application of federal anti-discrimination laws to the insurance industry." (collecting cases)). The majority position is consistent with the Second Circuit's ruling in *Spirt* and thus will be adopted by this Court.[20] Therefore, the McCarran-Ferguson Act does not reverse preempt Plaintiffs' FHA disparate impact claim.

---

[20] Additionally, the CFHA provides similar (albeit broader) protection against housing discrimination as the FHA, which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary with Connecticut's overall regulatory scheme. *See Nevels*, 359 F. Supp. 2d at 1123. ("[T]he application of the FHA will advance Washington State's interest, rather than impairing it.").

**III.     Conclusion**

For the reasons set forth above, Defendant's Motion [Doc. # 37] to dismiss the Second Amended Complaint is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of June, 2015.